UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

BONNIE BROWN and
JAMES BROWN,

                    Plaintiffs,

v.                                       Case No. 8:18-cv-136-T-60AEP

OCWEN LOAN SERVICING LLC,

                    Defendant.

_____/

## ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

This matter comes before the Court pursuant to Defendant Ocwen Loan Servicing LLC's Motion for Summary Judgment (Doc. # 39) and Plaintiffs Bonnie and James Brown's Motion for Summary Judgment (Doc. # 41), both filed on May 1, 2019. Each side filed responses in opposition and replies. (Doc. ## 46-47, 53-54). For the reasons that follow, the Browns' Motion for Summary Judgment is denied, and Ocwen's Motion for Summary Judgment is granted in part and denied in part.

## I.   Background

Because Plaintiffs share the same last name, the Court will refer to them by their first names, James and Bonnie. In 1998, before she married James in 2011, Bonnie obtained a mortgage to purchase her former residence located in Brooksville, Florida. (Doc. # 40 at ¶ 1; Doc. # 42 at ¶¶ 1-2). James is not a borrower on the mortgage, but he resided with Bonnie at the property

and was authorized to speak with Ocwen and handle matters related to the mortgage on Bonnie's behalf. (Doc. # 42 at ¶¶ 1, 4).

Ocwen – a mortgage servicer that engages in activities such as collections, foreclosures, and property disposition efforts – began servicing Bonnie's mortgage in 2005. (Doc. # 40 at ¶ 2). Ocwen stores its borrowers' data in a program called "RealServicing Loan Platform." (*Id.* at ¶ 8). Within this program, Ocwen identifies certain borrowers – for example, those who are in default or eligible for loan modifications – and creates a call list. (*Id.* at ¶ 9). This call list is transferred from RealServicing to a software called "Advanced List Management" (ALM), which is created by Aspect Software, Inc. (*Id.* at ¶¶ 9-10). Using ALM, Ocwen representatives configure how calls are to be placed to the numbers on the call list. (*Id.* at ¶ 10). Next, Ocwen transfers that call list with its dialing rules from ALM to another software created by Aspect, "Unified IP" (UIP). (*Id.*). Then, UIP begins dialing Ocwen's borrowers using the call list. (*Id.*). Before any call is connected to an Ocwen representative, the call is placed in the "disposition queue." (Doc. # 54-2 at ¶ 6). Calls that are not connected with an Ocwen representative right away are placed into the "wait queue." (*Id.*). Although ALM and UIP are separate software, together they are referred to as the "Aspect dialer." (Doc. # 42 at ¶ 37; Doc. # 49 at 6).

In 2013, Bonnie was in default, so she applied for a loan modification

through the Home Affordable Modification Program (HAMP). (Doc. # 42 at ¶ 5). In early 2014, the loan modification was approved, but Bonnie immediately defaulted on the modification because she was still unable to make the modified payments. (*Id.*). According to the Browns, Ocwen encouraged Bonnie to submit additional loan modification applications, though this encouragement is disputed by Ocwen. (*Id.* at ¶¶ 5-7; Doc. # 49 at 1-2). The Browns further aver that Ocwen led them to believe Bonnie could obtain another loan modification, even though Ocwen knew Bonnie was in fact ineligible for another modification. (Doc. # 42 at ¶¶ 9-10). Ocwen likewise disputes this, contending Bonnie was eligible for other loan modifications, though she was not eligible for another loan modification through HAMP. (Doc. # 49 at 2-3).

Regardless, Bonnie ended up submitting at least five loan modification applications betweem 2014 and 2015. (Doc. # 42 at ¶¶ 5-7). Bonnie listed her cellphone number ending in -5620 on the loan modification applications. (Doc. # 40 at ¶ 3). Among other things, the applications stated, "I consent to being contacted concerning this request for mortgage assistance at any e-mail address or cellular or mobile telephone number I have provided to the Servicer." (Doc. # 46 at 13; Doc. # 46-12). From January 21, 2014, until August 29, 2016, Ocwen used its Aspect dialer to place 416 calls to the -5620 number. (Doc. # 42 at ¶ 11). According to the Browns, they answered ninety-

3

eight calls where Ocwen used a prerecorded or artificial voice. (*Id.* at ¶¶ 44-45; Doc. # 47 at 3).

Before 2016, Bonnie was the primary user of the -5620 number, which is issued through Boost Mobile. (Doc. # 42 at ¶ 12). The Browns have shared a cellphone account with Boost Mobile since 2011, and the Browns use joint money to pay for their account. (*Id.*). In March or April 2016, Bonnie got a new cellphone number, so James started using the -5620 number. (*Id.* at ¶ 13). Neither Bonnie nor James informed Ocwen that the -5620 number was no longer Bonnie's phone number or that James was now the primary user of the -5620 number. (Doc. # 40 at ¶ 5).

Despite her attempts to obtain a loan modification, a foreclosure complaint seeking a deficiency judgment was filed against Bonnie on March 5, 2016. (Doc. # 42 at ¶ 14). On April 22, 2016, the foreclosure court served Bonnie with an order setting the final foreclosure hearing for June 20, 2016. (*Id.* at ¶ 15). Thereafter, multiple Ocwen representatives called the -5620 number, but the representatives were unaware that a foreclosure hearing had been set, so they advised Bonnie to submit additional loan modification applications. (Doc. # 42-15; Doc. # 42-5 at 12-13). After these phone calls, the Browns concluded the modification applications and phone calls with Ocwen were fruitless endeavors. (Doc. # 42-1 at ¶ 10; Doc. # 42-2 at ¶ 8).

On May 20, 2016, an Ocwen representative called the -5620 number to

discuss Bonnie's "intentions with the property" and a possible short-sale or surrender of the property. (Doc. # 42 at ¶ 18; Doc. # 42-16 at 2). Bonnie answered the phone, but after the representative explained the purpose of the call and noted the call was an attempt to collect a debt, Bonnie told the Ocwen representative to speak with James. (Doc. # 42-16 at 2). James proceeded to tell the Ocwen representative that any issues would be decided at the upcoming foreclosure hearing on June 20, 2016. (*Id.* at 3-4). Further, James told the Ocwen representative that the call would not "make any difference at all" because there was "really nothing for [the representative] and [James] to discuss." (*Id.*).

After the May 20, 2016, phone call, Ocwen used its Aspect dialer to place 192 phone calls to the -5620 number. (Doc. # 42 at ¶ 19). Specifically, except for twelve days, Ocwen called the -5620 number every day until August 29, 2016. (*Id.* at ¶¶ 11, 30). And unless the previous call that day was answered, Ocwen almost always called the -5620 number three times per day, which is permitted under Ocwen's policies. (*Id.*). The Browns answered only forty-three of these calls, though. (*Id.* at ¶ 19). When Ocwen's calls were answered, Ocwen's representatives explained the calls were an attempt to collect a debt. (*Id.* at ¶ 28). James answered most of the calls because he had the phone with him at work. (*Id.* at ¶ 26). Bonnie stated during her deposition that she did not answer any calls after James started using the -

5620 number, but Ocwen's records indicate Bonnie personally answered a few calls or at least spoke to Ocwen after James initially answered the phone. (Doc. # 39-6 at 16-17; Doc. # 42-16; Doc. # 42-18 at 2-3; Doc. # 42-19 at 8; Doc. # 42-20). When James answered the phone, Ocwen asked to speak with Bonnie or asked James to leave Bonnie a message for her to call Ocwen back. (Doc. # 42 at ¶ 26).

On June 4, 2016, during another phone call from Ocwen to the -5620 number, James complained of the daily phone calls from Ocwen, stated he would report the representative for "harassment," and asked Ocwen to "[q]uit calling" him and Bonnie. (*Id.* at ¶ 20; Doc. # 42-17). Thereafter, James again requested Ocwen to "quit calling" him and Bonnie on June 11 and 17, 2016. (Doc. # 42-19 at 2-7).

The foreclosure hearing took place on June 20, 2016, and a final judgment of foreclosure was entered that same day. (Doc. # 42 at ¶ 22). Nevertheless, Ocwen continued to call the -5620 number after the foreclosure. James requested Ocwen to "quit calling" him and Bonnie on multiple occasions after the foreclosure – specifically, on June 30, 2016; July 12, 13, 16, and 29, 2016; and August 4, 7, 8, 16, and 18, 2016. (Doc. # 42-19 at 2-3, 5, 7, 9-19). Bonnie similarly asked Ocwen to stop calling on June 29 and July 1, 2016. (Doc. # 42 at ¶ 23; Doc. # 42-18 at 3; Doc. # 42-19 at 8). After the Browns moved out, the property was sold at auction on August 25, 2016.

6

(Doc. # 42 at ¶ 22). Shortly thereafter, the calls to the -5620 number from Ocwen stopped. (*Id.* at ¶ 11).

According to the Browns, Ocwen's phone calls took a toll on them. James was suffering from a heart condition, Bonnie was caring for her sick grandmother, and Bonnie's mother and father passed away in September 2015 and May 2016, respectively. (*Id.* at ¶ 33). The Browns informed Ocwen of these circumstances, but Ocwen did not record this information in Bonnie's account because the Browns failed to follow certain authentication procedures. (Doc. # 49 at 5). James even allegedly lost two jobs after clients overheard him tell Ocwen to stop calling because the property had been foreclosed. (Doc. # 42 at ¶ 34). The Browns fought nearly every day over Ocwen's calls. (*Id.* at ¶ 35). James vented to Bonnie about Ocwen's calls, and Bonnie felt "helpless to stop the calls." (*Id.*).

As a result, on January 17, 2018, the Browns brought this action against Ocwen for violations of the Telephone Consumer Protection Act (TCPA) and the Florida Consumer Collection Practices Act (FCCPA). (Doc. # 18). The parties have now filed cross-Motions for Summary Judgment. (Doc. ## 39, 41).

## II.    <u>Legal Standard</u>

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(a). A properly supported motion for summary judgment is not defeated by the existence of a factual dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Only the existence of a genuine issue of material fact will preclude summary judgment. *Id.*

An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* A fact is material "if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997). The moving party bears the initial burden of showing that there are no genuine issues of material fact. *Hickson Corp. v. N. Crossarm Co., Inc.*, 357 F.3d 1256, 1260 (11th Cir. 2004). When the moving party has discharged its burden, the nonmoving party must then designate specific facts showing the existence of genuine issues of material fact. *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593-94 (11th Cir. 1995). If there is a conflict between the parties' allegations or evidence, the nonmoving party's evidence is presumed to be true and all reasonable inferences must be drawn in the nonmoving party's favor. *Shotz v. City of Plantation*, 344 F.3d 1161, 1164 (11th Cir. 2003).

The standard for cross-motions for summary judgment is not different from the standard applied when only one party moves for summary

judgment. *Am. Bankers Ins. Grp. v. United States*, 408 F.3d 1328, 1331 (11th Cir. 2005). The Court must consider each motion separately, resolving all reasonable inferences against the party whose motion is under consideration. *Id.* "Cross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984) (quoting *Bricklayers Int'l Union, Local 15 v. Stuart Plastering Co.*, 512 F.2d 1017 (5th Cir. 1975)).

## III.   <u>Discussion</u>

Bonnie brings claims under the FCCPA (Count I) and the TCPA (Count II), while James brings claims under only the TCPA (Count III). Ocwen moves for summary judgment on all claims. The Browns move for summary judgment on Bonnie's FCCPA claim and James's TCPA claim, but not on Bonnie's TCPA claim. The Court will address the TCPA and FCCPA claims separately.

### A.   <u>TCPA</u>

In Counts II and III, Bonnie and James allege Ocwen violated 47 U.S.C. § 227(b)(1)(A)(iii) by placing calls to the -5620 number using an automatic telephone dialing system (ATDS) or an artificial or prerecorded voice. (Doc. # 18 at 10-12). Bonnie's claim in Count II is based on the calls

Ocwen placed to the -5620 number before March 2016, while James's claim in Count III is based on the calls placed after March 2016. (*Id.*).

Section 227(b)(1)(A)(iii) prohibits "using any automatic telephone dialing system or an artificial or prerecorded voice" to call a cellphone number without "the prior express consent of the called party." 47 U.S.C. § 227(b)(1)(A)(iii). For each violation of the TCPA, a party may recover the greater of her actual monetary losses or $500 in damages. *Id.* § 227(b)(3)(B). Additionally, the Court has the discretion to "increase the amount of the award to an amount equal to not more than 3 times the amount available" if it finds the defendant's violation of the TCPA was willful or knowing. *Id.* § 227(b)(3)(C).

### 1.   Calls Using Any ATDS or an Artificial or Prerecorded Voice

Ocwen contends summary judgment on the Browns' TCPA claims is warranted because its Aspect dialer is not an ATDS under the TCPA. (Doc. # 39 at 8-20). The TCPA defines an ATDS as "equipment which has the capacity — (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1). According to Ocwen, following the D.C. Circuit's decision in *ACA International v. FCC*, 885 F.3d 687 (D.C. Cir. 2018), a dialing system must have the present ability to generate random or sequential numbers to

meet the definition of an ATDS. (Doc. # 39 at 13-15).

In support, Ocwen relies on *Gonzalez v. Ocwen Loan Servicing, LLC*, which held "the definition of an ATDS *would not include* a predictive dialer that lacks the capacity to generate random or sequential telephone numbers and dial them; but it *would include* a predictive dialer that has that capacity." No. 5:18-cv-340-Oc-30PRL, 2018 WL 4217065, at *6 (M.D. Fla. Sept. 5, 2018). The court in *Gonzalez* also explained that "a device [has] the capacity to generate random or sequential telephone numbers only if the device has the 'present ability' to do so." *Id.* (citing *ACA Int'l*, 885 F.3d at 695-97). Ocwen explains its Aspect dialer is not capable of generating and dialing random or sequential numbers. (Doc. # 39 at 18-20). Therefore, Ocwen contends its Aspect dialer is not an ATDS. (*Id.*). Having independently considered the issue, the Court agrees with *Gonzalez* and concludes Ocwen's Aspect dialer is not an ATDS under the TCPA. Summary judgment is therefore granted in favor of Ocwen on the Browns' TCPA claims based on the use of an ATDS.

Nevertheless, whether Ocwen's Aspect dialer meets the definition of an ATDS is not dispositive of the Browns' other TCPA claims. Specifically, in addition to claiming that Ocwen used an ATDS, the Browns also claim that Ocwen used an artificial or prerecorded voice when calling them. (Doc. # 18 at ¶¶ 59, 61). The TCPA prohibits calls "using any automatic telephone dialing

system *or* an artificial or prerecorded voice." 47 U.S.C. § 227(b)(1)(A)(iii) (emphasis added). Calls made using an artificial or prerecorded voice are independently actionable from calls made using an ATDS. *Whitehead v. Ocwen Loan Servicing, LLC*, No. 2:18-cv-470-FtM-99MRM, 2018 WL 5279155, at *4 (M.D. Fla. Oct. 24, 2018).

As Ocwen concedes, there are disputed issues regarding how many calls Ocwen placed using an artificial or prerecorded voice. (Doc. # 46 at 5). According to the Browns, they answered ninety-eight total calls "where they were put into a hold queue and heard a prerecorded or artificial voice message asking them to hold for a representative." (Doc. # 47 at 3). Forty-three of those calls were placed after May 20, 2016 – the date the Browns aver they revoked Ocwen's permission to call the -5620 number. (Doc. # 42 at ¶¶ 44-45). In support, the Browns rely on the "QUEUEENDDT" column of Ocwen's call logs, which according to the Browns, identifies calls that were placed in a "hold queue" and received a prerecorded or artificial voice message. (*Id.*; Doc. # 47 at 3). The Browns also rely on their deposition testimony, where Bonnie stated she received prerecorded or artificial voice messages "every day" and James stated he received them "a bunch of times." (Doc. # 42-8 at 72:17-19; Doc. # 42-9 at 53:5-21).

In response, Ocwen contends the Browns misconstrue the call logs. According to Ocwen, the "QUEUEENDDT" column does not identify calls

that received a prerecorded voice message. (Doc. # 54 at 2). Instead, the "QUEUEENDDT" column identifies when calls exited either the disposition queue or the wait queue. (*Id.*). Calls in the disposition queue that are not connected with an Ocwen representative right away are placed into the wait queue. (Doc. # 54-2 at ¶ 6). According to Ocwen, the "CALLQSTARTDT" column of its call logs identifies calls that were placed in the wait queue, and only calls that were in the wait queue for more than two seconds received a prerecorded voice message. (Doc. # 54 at 2). Seven calls made to the -5620 number were placed in the wait queue, and only four of those calls received a prerecorded voice message. (*Id.*). Thus, Ocwen contends the Browns' claims are limited to those four calls. (*Id.*). Ocwen's argument is supported by the declaration of its Director of Dialer and Workforce Management. (*Id.*; Doc. # 54-2).

These disputed issues regarding how many calls were placed to the -5620 number using an artificial or prerecorded voice preclude summary judgment on the Browns' remaining TCPA claims for either side.

## 2.   <u>Prior Consent</u>

A defendant is not liable for making calls under the TCPA if the calls were "made with the prior express consent of the called party." 47 U.S.C. § 227(b)(1)(A). "No specific method is required under the TCPA for a caller to obtain prior consent to place automated calls." *Lawrence v. Bayview Loan*

*Servicing, LLC*, 666 F. App'x 875, 879 (11th Cir. 2016). For example, "the provision of a mobile phone number, without limiting instructions, suffices to establish the consumer's general consent to be called under the TCPA." *Id.* at 880. Conversely, consent is revocable, and no specific method is required under the TCPA to revoke consent. *Id.* at 879-80. Accordingly, a consumer may orally revoke her consent. *Osorio v. State Farm Bank, F.S.B.*, 746 F.3d 1242, 1255 (11th Cir. 2014). Nevertheless, "the TCPA requires—at a minimum—express and clear revocation of consent; implicit revocation will not do." *In re Runyan*, 530 B.R. 801, 807 (M.D. Fla. 2015). Prior express consent is an affirmative defense; therefore, the defendant bears the burden of establishing that it had the called party's consent. *Osorio*, 746 F.3d at 1253; *Murphy v. DCI Biologicals Orlando, LLC*, 797 F.3d 1302, 1304-05 (11th Cir. 2015).

Ocwen argues Bonnie consented to receiving calls when she listed the -5620 number on her loan modification applications. (Doc. # 46 at 12-14). Ocwen concedes that Bonnie revoked her consent on June 29, 2016, but nevertheless argues any calls placed before then did not violate the TCPA. (*Id.*). Aside from the fact that Ocwen still placed numerous calls to the -5620 number after June 29, 2016 (Doc. # 42 at ¶ 24; Doc. # 49 at 4), there are disputed issues of material fact that preclude Ocwen from establishing consent for all the calls prior to June 29, 2016.

To begin, there are disputed issues regarding whether Ocwen obtained valid consent to call the -5620 number and whether Ocwen's calls exceeded the scope of whatever consent it had to call the -5620 number. Bonnie argues Ocwen obtained her consent in the loan modification applications under false pretenses. (Doc. # 53 at 2). According to Bonnie, because Ocwen knew she could not obtain another loan modification, any consent Ocwen received through the loan modification applications was not valid. (*Id.*). Ocwen, by contrast, contends that Bonnie was in fact eligible for other loan modifications. (Doc. # 49 at 2).

Bonnie also argues that Ocwen's calls exceeded the scope of her consent. According to Bonnie, her consent was for the limited purpose of allowing Ocwen to call her regarding the loan modification applications, yet not all of Ocwen's calls were related to the loan modifications. (Doc. # 53 at 2). "[T]he TCPA allows a consumer to provide limited, i.e., restricted, consent for the receipt of automated calls." *Schweitzer v. Comenity Bank*, 866 F.3d 1273, 1277 (11th Cir. 2017). If a consumer provides limited consent to receive automated calls, it is the caller's burden of establishing that the purpose of its calls was within the consumer's limited consent. *See id.* at 1276 ("[I]f an actor exceeds the consent provided, the permission granted does not protect him from liability for conduct beyond that which is allowed."); *Gambon v. R & F Enters., Inc.*, No. 6:14-cv-403-Orl-18GJK, 2015 WL 64561, at *4 (M.D. Fla.

15

Jan. 5, 2015) ("[T]he purpose of the call and existence of prior express consent are . . . affirmative defenses for which the defendant bears the burden of proof."). According to Ocwen, "the evidence shows most of the calls were made in an effort to reach [Bonnie] in direct response to her modification applications." (Doc. # 39 at 25). Yet Ocwen does not specify the exact calls that were made to reach Bonnie regarding her loan modification applications. Plus, proof that "most of the calls" may have been within Bonnie's limited consent does not satisfy Ocwen's burden of proving that all of the calls were within Bonnie's limited consent.

Furthermore, Ocwen's argument assumes that only Bonnie could revoke Ocwen's permission to call the -5620 number. However, consent to call a given number must come from the "called party." 47 U.S.C. § 227(b)(1)(A). "Called party" does not mean the caller's intended recipient. *See Osorio*, 746 F.3d at 1252 ("We accordingly reject State Farm's argument that the 'intended recipient' is the 'called party' referred to in 47 U.S.C. § 227(b)(1)(A)."). Instead, "called party" means the current subscriber to the phone service. *Breslow v. Wells Fargo Bank, N.A.*, 755 F.3d 1265, 1267 (11th Cir. 2014). A phone service's current subscriber is "the person who pays the bills or needs the line in order to receive other calls." *Osorio*, 746 F.3d at 1251 (quoting *Soppet v. Enhanced Recovery Co., LLC*, 679 F.3d 637, 640 (7th Cir. 2012)).

16

When James became the primary user of the -5620 number in March 2016, he became the -5620 number's subscriber. James was therefore the called party for purposes of Section 227(b)(1)(A) when Ocwen called the -5620 number between March and August 2016. The parties' arguments assume that Bonnie's consent allowing Ocwen to call the -5620 number constituted consent for James as well. Logically, a party cannot revoke consent when it never gave consent in the first place. Thus, assuming Ocwen had permission to call James, the relevant inquiry is whether James – rather than Bonnie – revoked the consent to call the -5620 number between March and August 2016.

Nevertheless, as Ocwen concedes, there are disputed issues regarding whether James revoked whatever consent Ocwen had to call the -5620 number. (Doc. # 46 at 5). James argues he revoked Ocwen's permission to call the -5620 number during a phone call from an Ocwen representative on May 20, 2016. (Doc. # 41 at 11-12). Ocwen argues James's statements during the May 20, 2016, call did not constitute sufficient revocation. (Doc. # 49 at 4). There is also evidence demonstrating James requested Ocwen to "quit calling" on multiple occasions from June until August 2016. (Doc. # 42 at ¶¶ 20-25). Whether James revoked his consent is a question for the jury that cannot be resolved on summary judgment. *See Miller v. Ginny's Inc.*, 287 F. Supp. 3d 1324, 1329 (M.D. Fla. 2017) ("Courts have repeatedly held that where evidence conflicts as to whether consent was orally revoked, summary

judgment is not proper."); *Smith v. Markone Fin., LLC*, No. 3:13-cv-933-J-32MCR, 2015 WL 419005, at *3 (M.D. Fla. Feb. 2, 2015) ("Disagreement over whether consent was orally revoked precludes summary judgment.").

In sum, the Browns' remaining TCPA claims are those based on Ocwen's alleged use of an artificial or prerecorded voice. Ocwen failed to carry its burden of establishing prior consent because there are still disputed issues regarding the existence, scope, and revocation of whatever consent Ocwen had to call the -5620 number. Finally, because summary judgment is denied for both sides on the Browns' remaining TCPA claims, the Court will not address the Browns' argument that James is entitled to treble damages under Section 227(b)(3). (Doc. # 41 at 23-25).

## B.   <u>FCCPA</u>

In Count I, Bonnie alleges Ocwen violated Section 559.72(7), *Florida Statutes*, because Ocwen's calls to the -5620 number were harassing and abusive. (Doc. # 18 at 9-10). Before discussing the merits of Ocwen and the Browns' Motions, the Court must determine the relevant period for Bonnie's FCCPA claim. "An action brought under [the FCCPA] must be commenced within 2 years after the date the alleged violation occurred." § 559.77(4), *F.S.* The Amended Complaint and the Browns' Motion for Summary Judgment discuss calls placed by Ocwen to the -5620 number between January 21, 2014, and August 29, 2016. (Doc. # 18 at 4-10; Doc. # 41 at 5; Doc. # 42 at ¶

18

11). The Browns filed this suit on January 17, 2018. (Doc. # 1). Accordingly, only calls placed on or after January 17, 2016, are actionable. Ocwen did not make any more calls to the -5620 number after August 29, 2016. (Doc. # 42 at ¶ 11). Thus, the relevant period for Bonnie's FCCPA claim is January 17, 2016, through August 29, 2016 – a little more than seven months.

Section 559.72(7) provides that a person violates the FCCPA if they "[w]illfully communicate with the debtor or any member of her or his family with such frequency as can reasonably be expected to harass the debtor or her or his family, or willfully engage in other conduct which can reasonably be expected to abuse or harass the debtor or any member of her or his family." § 559.72(7), *F.S.* Generally, whether communications or other conduct were willful and harassing are factual issues for the jury to decide. *See McCaskill v. Navient Sols., Inc.*, 178 F. Supp. 3d 1281, 1296 (M.D. Fla. 2016) ("[T]he question of whether conduct is harassing or abusive is ordinarily an issue for the factfinder."); *Ortega v. Collectors Training Inst. of Ill., Inc.*, No. 09-21744-CIV, 2011 WL 241948, at *9 (S.D. Fla. Jan. 24, 2011) ("Florida courts have determined that whether calls are willful and harassing are factual issues for the jury's determination.").

Proof of frequent calls, however, does not automatically demonstrate a triable issue of fact at the summary judgment stage. *Story v. J.M. Fields, Inc.*, 343 So. 2d 675, 677 (Fla. 1st DCA 1997), *cert. denied*, 348 So. 2d 954

19

(Fla. 1977). Instead, liability under Section 559.72(7) is a fact-intensive inquiry, determined by "the purpose as well as the frequency of the creditor's calls." *Id.* Courts consider "not only the frequency of the calls but also the legitimacy of the creditor's claim, the plausibility of the debtor's excuse, the sensitivity or abrasiveness of the personalities and all other circumstances that color the transaction." *Id.* Accordingly, even if numerous calls were made, Section 559.72(7) is not violated where "the creditor called only to inform or remind the debtor of the debt, to determine his reasons for nonpayment, to negotiate differences or to persuade the debtor to pay without litigation." *Id.* "However, if calls 'continue after all such information has been communicated and reasonable efforts at persuasion and negotiation have failed,' then the communication 'can reasonably be expected to harass the debtor' and 'tends only to exhaust the resisting debtor's will.'" *Miller*, 287 F. Supp. 3d at 1330-31 (quoting *Story*, 343 So. 2d at 677).

Ocwen argues summary judgment on Bonnie's FCCPA claim is warranted because Bonnie was not harassed or abused. (Doc. # 39 at 21-23). Specifically, Ocwen contends Bonnie was not harassed because she did not personally receive any phone calls; instead, James received the calls. (*Id.* at 21-22). Ocwen's argument is unavailing, as there is evidence showing Bonnie answered some of the calls and spoke with Ocwen representatives. More importantly, Section 559.72(7) expressly prohibits harassing communications

with a member of the debtor's family, such the debtor's spouse. § 559.72(7),

*F.S.* Thus, a debtor need not personally receive the calls to bring a claim

under Section 559.72(7) if the creditor communicated with a member of the

debtor's family in a manner that could reasonably be expected to harass the

debtor.

Ocwen further argues Bonnie was not harassed because "*her* claim

rests in its entirety on the number and frequency of the calls." (Doc. # 39 at

22). True, "courts will grant summary judgment where a plaintiff rests on the

number of phone calls, without other evidence of harassing conduct."

*McCaskill*, 178 F. Supp. 3d at 1296. Here, however, Bonnie has presented

evidence of harassment beyond the number of calls. For example, there is

evidence demonstrating multiple phone calls were made after the Browns

requested Ocwen stop calling them. *See Smith*, 2015 WL 419005, at *6

("Proof of frequent calls, continuing after the plaintiff told the defendant to

stop calling, is sufficient to demonstrate a triable issue of fact."). This

evidence alone distinguishes the cases relied on by Ocwen. *Cf. Lardner v.

Diversified Consultants Inc.*, 17 F. Supp. 3d 1215, 1226 (S.D. Fla. 2014)

("Plaintiff does not set forth any additional evidence of egregious or harassing

behavior, such as requesting the communications stop."); *Tucker v. CBE Grp.,

Inc.*, 710 F. Supp. 2d 1301, 1305 (M.D. Fla. 2010) ("Plaintiff has not

demonstrated that [Defendant] engaged in oppressive conduct such as

repeatedly making calls after it was asked to cease."). Furthermore, Bonnie's FCCPA claim rests on other circumstances that may suggest harassment, such as Ocwen's possible knowledge of the Browns' personal difficulties.

Next, Ocwen argues summary judgment on Bonnie's FCCPA claim is warranted because Ocwen's conduct was not willful. (Doc. # 39 at 23-25). The plain language of Section 559.72(7) requires the defendant act "willfully." *Bacelli v. MFP, Inc.*, 729 F. Supp. 2d 1328, 1337-38 (M.D. Fla. 2010). "Willfully" is not defined by the FCCPA, but Florida courts have noted in the context of the FCCPA that "[a] thing is willfully done when it proceeds from a conscious motion of the will, intending the result which actually comes to pass. It must be designed or intentional, and may be malicious, though not necessarily so." *Story*, 343 So. 2d at 677 (quoting *Chandler v. Kendrick*, 146 So. 551, 552 (Fla. 1933)); *see also Harrington v. Roundpoint Mortg. Servicing Corp.*, No. 2:15-cv-322-FtM-38MRM, 2017 WL 1378539, at *10 (M.D. Fla. Apr. 11, 2017) ("[T]he statute's use of the word 'willful' means that the calls must be done consciously.").

According to Ocwen, Bonnie "cannot show that Ocwen willfully placed calls to [James] because all of the evidence demonstrates that Ocwen placed calls to the [-5620 number] in an effort to communicate with [Bonnie], not her husband." (Doc. # 39 at 23-24). In other words, Ocwen interprets Section 559.72(7) as requiring proof that the debt collector's conscious objective was

to call the specific person who answered the phone. Ocwen offers no case law interpreting Section 559.72(7) so narrowly, and the Court is unpersuaded. *Cf. Desmond v. Accounts Receivable Mgmt., Inc.*, 72 So. 3d 179, 181 (Fla. 2d DCA 2011) (explaining Section 559.72(7) applies to situations of mistaken identity, where the creditor calls the wrong number and alleges the unintended recipient of the call owes a debt).

Regardless of Ocwen's interpretation of the statute, the Court concludes Ocwen willfully communicated with Bonnie for purposes of Section 559.72(7). As Ocwen concedes, its conscious objective of placing calls to the -5620 number was to communicate with Bonnie about her debt. (Doc. # 39 at 23-24). Bonnie answered Ocwen's calls and spoke with its representatives on a few occasions. Thus, if Ocwen's conscious objective was to speak with Bonnie, and Ocwen did in fact speak directly with Bonnie, then Ocwen willfully communicated with Bonnie.

Likewise, Ocwen achieved its conscious objective of communicating with Bonnie by indirectly communicating with her through its calls to the -5620 number and its conversations with James. "Communication" is defined broadly under the FCCPA as "the conveying of information regarding a debt directly or indirectly to any person through any medium." § 559.55(2), *F.S.* James often complained to Bonnie about the missed calls from Ocwen. *See Brown v. Flagstar Bancorp, Inc.*, No. 8:13-cv-2596-T-33TBM, 2014 WL

23

408821, at *2 (M.D. Fla. Feb. 3, 2014) (indicating unanswered calls may constitute indirect communications under the FDCPA, which uses an identical definition of "communication" as the FCCPA). Further, Ocwen spoke with James about Bonnie's debt and asked James to leave Bonnie messages for her to call Ocwen back. *See Miceli v. Orange Lake Country Club, Inc.*, No. 6:14-cv-1602-Orl-41DAB, 2015 WL 5081621, at *4 (M.D. Fla. Aug. 5, 2015) (holding defendant's voicemails left on plaintiffs' cellphones requesting plaintiffs or their spouses return defendant's calls to discuss debt constituted indirect communication); *In re Runyan*, 530 B.R. at 808 (holding creditor's communications with debtor's spouse regarding debt constituted indirect communications). Thus, if Ocwen's conscious objective was to communicate with Bonnie about her debt, then Ocwen willfully communicated with Bonnie, albeit indirectly.

Ocwen also argues its conduct was not willful because it did not call the Browns with the intent to harass. According to Ocwen, "the evidence shows most of the calls were made in an effort to reach [Bonnie] in direct response to her modification applications." (Doc. # 39 at 25). Additionally, "at least one of the purposes of Ocwen's calls was to offer [Bonnie] the opportunity to redeem her home." (*Id.*). Yet evidence showing "most of the calls" or "at least one" of the calls were motivated by Bonnie's modification applications or an opportunity to redeem her home does not mean all of the

24

calls were motivated by these things. *See Scott v. Fla. Health Scis. Ctr., Inc.*, No. 8:08-cv-1270-T-24-EAJ, 2008 WL 4613083, at *4 ("Where the nature of the collection attempts is ambiguous, evaluating the factual circumstances and determining whether they constitute harassment or abuse becomes a question of fact falling within the province of the jury.").

Moreover, regardless of Ocwen's purported motivation for the calls, Ocwen made some of the calls after the Browns requested Ocwen stop calling them. *See Miller*, 287 F. Supp. 3d at 1331 ("[C]alling after being asked to stop may constitute egregious conduct in conjunction with daily calls that could be considered to harass a debtor."). Accordingly, Ocwen's request for summary judgment on Bonnie's FCCPA claim is due to be denied.

However, Bonnie is not entitled to summary judgment on her FCCPA claim either. Between May 20, 2016, and August 29, 2016, Ocwen placed 192 calls to the -5620 number, despite the Browns' multiple requests that Ocwen "quit calling." Ocwen called the -5620 number nearly every day during this three-month period, and unless the previous call that day was answered, Ocwen almost always called three times per day. *See Harrington*, 2017 WL 1378539, at *11 (explaining "other egregious conduct" in addition to numerous calls includes "calling multiple times in a single day . . . or calling after being asked to stop"). Further, these calls continued after the foreclosure proceeding began and even after the property was foreclosed. *See*

25

*id.* ("[I]t is foreseeable that [defendant's] conduct could be considered to be harassing by [plaintiff], who continued to receive calls after being referred to [defendant's] attorney, and indeed after the litigation process had started in the underlying foreclosure case.").

Nevertheless, whether these calls were harassing under Section 559.72(7) is a jury question. *See Pollock v. Bay Area Credit Serv., LLC*, No. 08-61101-Civ, 2009 WL 2475167, at *9 (S.D. Fla. Aug. 13, 2009) ("[T]he 187 phone calls presents a factual issue as to whether the actions were willful and harassing."); *Story*, 343 So. 2d at 677-78 (holding 100 calls over five months, where calls came almost daily and sometimes two or three times per day, continuing after defendant was told to quit calling, presented a jury question); *cf. Lardner*, 17 F. Supp. 3d at 1226 (holding 132 calls over eight months was insufficient to establish a jury question where plaintiff produced no other evidence, "such as requesting the communications stop").

Additionally, while Ocwen concedes its permission to call the -5620 number was revoked at some point (Doc. # 46 at 12-14), there are disputed issues regarding exactly when this permission was revoked. *See Miller*, 287 F. Supp. 3d at 1331 (declining to grant summary judgment on claim under Section 559.72(7) because there was conflicting evidence regarding consent). Consequently, the Browns' request for summary judgment on Bonnie's FCCPA claim is due to be denied as well.

26

IV.    **Conclusion**

As outlined above, the Browns' Motion for Summary Judgment is denied and Ocwen's Motion for Summary Judgment is granted in part and denied in part. Summary judgment is granted in favor of Ocwen on the Browns' TCPA claims based on the use of an ATDS. Thus, the Browns' remaining TCPA claims are those based on Ocwen's alleged use of an artificial or prerecorded voice. The existence, scope, and revocation of whatever consent Ocwen had to call the -5620 number is a question for the jury. Likewise, whether Ocwen's calls were harassing under Section 559.72(7) is also a question for the jury.

Accordingly, it is

**ORDERED, ADJUDGED,** and **DECREED:**

(1)    Defendant Ocwen Loan Servicing LLC's Motion for Summary Judgment (Doc. # 39) is **GRANTED IN PART AND DENIED IN PART**.

(2)    Ocwen's Motion for Summary Judgment is **GRANTED** to the extent judgment shall be entered in Ocwen's favor for Plaintiffs Bonnie and James Brown's TCPA claims based on Ocwen's alleged use of an automatic telephone dialing system. Ocwen's Motion for Summary Judgment is **DENIED** as to the Browns' remaining TCPA and FCCPA claims.

(3)    The Browns' Motion for Summary Judgment (Doc. # 41) is **DENIED**.

    **DONE** and **ORDERED** in Chambers, in Tampa, Florida, this <u>5th</u> day

of September, 2019.

**TOM BARBER**
**UNITED STATES DISTRICT JUDGE**